## ANDERSON v. MUNSON.

(District Court, S. D. New York. November 16, 1900.)

**1. SHIPPING—CONSTRUCTION OF TIME CHARTER—OVERRUNNING TIME.**

Whether a clause in a time charter, "hire to continue from the time specified for terminating the charter until her delivery to owner," authorizes the charterer to dispatch the vessel on a voyage which, owing to the short time remaining, it is known cannot be completed until after the expiration of the charter, or whether it provides only for an unexpected detention beyond the charter period, since either construction is consistent with its language, is a question which may properly be determined by evidence of the custom and usage under such charters.

**2. SAME.**

A time charter, with extensions covering a year, contained a provision, "hire to continue from the time specified for terminating the charter until her delivery to owner." The charter specified voyages from ports in the United States to Cuban, Mexican, or South American ports, and the vessel in fact made four voyages to Mexico and two to Cuba during the year, and completed discharging from the last voyage 13 days before the expiration of the charter period. Her hire amounted to about $150 per day. *Held*, that under a reasonable construction of such clause, in view of the practice and usage of the port of New York, as shown by the testimony, the charterer was entitled to dispatch the vessel on another voyage, although it could not be completed before the expiration of the charter period, but that, the only purpose of the custom being to enable him to obtain the beneficial use of the vessel during the remaining time for which he was bound to pay the hire, he could not reasonably require her to make a voyage to Mexico which would require 8 or 9 weeks, but could send her on another voyage to Cuba, which was the shortest contemplated by the charter, and was required to pay at the charter rate until her return and delivery to the owner.

In Admiralty. Libel and cross libel to determine rights under a charter.

Convers & Kirlin, for owner.
Wheeler & Cortis, for charterer.

BROWN, District Judge. The above libels have been filed in consequence of a dispute between the owner and the charterer of the British steamship Jacob Bright of 2,718 tons gross, as to their respective rights and obligations in regard to the despatch of the vessel on a new voyage a short time before the close of a time charter.

The charter was dated March 14, 1898, chartering the steamer to Mr. Munson—

"For the term of six calendar months from the day of delivery * * * to be employed as the charterers or their agents shall direct in lawful trades between safe port and/or ports in British North America, between May 1st and September 1st, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or South America (not south of River Platte), and/or Europe, * * * at the rate of £925 per month, with an option of continuing the charter for a further period of three months, and/or three months more upon giving 15 days notice previous to expiration of first named term, with liberty of subletting if required."

The charterer used both options on due notice, and the vessel having been delivered under the charter on June 7, 1898, the full term

104 F.—58

of 12 months expired on June 7, 1899, at the same hour of her delivery. The vessel was not in fact redelivered to the owner until July 26th. Freights in the meantime had considerably advanced, and the first libel was filed to recover the balance of charter hire remaining unpaid for the charter period, and also for additional compensation at the market rate of freights from and after June 7, 1899, to July 26th.

The provision of the charter as respects the hire was as follows:

"(3) That the charterers shall pay for the use and hire of the said vessel at the rate of £925 Br. Stlg. per calendar month commencing on and from the day of her delivery and at and after the same rates for any part of a month; hire to continue from the time specified for terminating the charter until her delivery to owner (unless lost) at a port in the United States north of Hatteras."

On May 25, 1899, the vessel was in New York, having on that day completed her discharge on a prior voyage, and the charterer thereupon ordered her to Philadelphia to load a cargo for Tampico, Mexico. The time ordinarily occupied for such a voyage and return was about 60 days, which would overrun the termination of the charter by 47 days. The master, considering that the charterer had no right to the use of the steamer beyond the termination of the charter period, offered to proceed to Philadelphia as ordered, but refused to load a cargo for Tampico; the charterer insisted upon obedience to orders, and the vessel thereupon proceeded to Philadelphia, and arrived there on May 26th, when the master repeated his refusal to load for Tampico. After considerable negotiation, occupying four days, the master agreed under protest to load for Cuba, proceeded thither, and returned with cargo after many delays, and the ship was redelivered to the owner on July 26th, as above stated. The charterer in the meantime procured another vessel to carry the cargo to Tampico, which he had designed for the Jacob Bright, but was obliged to pay for the hire of the substituted vessel the sum of $2,141.11 in excess of the charter rates of the Jacob Bright for the same period. In the cross libel, the charterer claims to recover this amount of the owner of the Jacob Bright, as well as a deduction of four days' hire for time lost during the dispute in Philadelphia, and also for further alleged unjustifiable delays of the vessel in Cuba.

1. The charter is obviously purely a time charter. The charterer would have no legal right to make use of the vessel a day beyond the expiration of the charter term, and he would be bound to pay for any such actual use the market rates after the lapse of the charter term, were it not for the following clause in paragraph 3: "Hire to continue from the time specified for terminating the charter until her delivery to owner." The rights of the parties must depend I think upon the construction and effect to be given to that clause.

Although this form of time charter with the same additional clause has been in use to a considerable extent for at least 20 or 30 years (see Scrutton, Charter Parties), no direct adjudication as to the charterer's right to despatch the vessel near the close of the term has been found, save the implication in Gray v. Christie, 5 Times L. R. 577. Other forms of charter party avoid the difficulty here encountered,

either by some express provision for a continuation of the charter until a return of the ship in case she shall be on a voyage at the end of the charter period, as in McGilvery v. Capen, 73 Mass. 525; or by providing "for as many voyages as the ship can enter upon" during the specified period, as in Tully v. Howling, 2 Q. B. Div. 182. In such cases it is clear that a vessel may enter upon a voyage up even to the last day of the charter period, and thereby obtain a virtual extension of the charter, paying for such extension either the charter rates or the market rates, as the charter itself shall provide. Where no such provision is made and there is no such clause as the one above cited, and the charter provides only for as many voyages as can be made within the specified period, the charterer takes all the risks, and may lose a considerable part of the charter period, if near the close of the charter another voyage cannot be completed within the specified term, as has recently been held in the case of The Mary Adelaide Randall (D. C.) 93 Fed. 222, affirmed in 39 C. C. A. 335, 98 Fed. 895.

The uncertainties of navigation, however, are so great that in all time charters contemplating several voyages, it is almost certain that the voyages cannot be so arranged as to precisely fill up the charter period without running over the time limit. An additional uncertainty, which may upset the charterer's best calculations, arises from the liability of the vessel to be laid up more or less for repairs during the charter period, as actually happened in this case. The charterer on the other hand is bound to pay in full to the last day of the charter period whether he uses the vessel or not, provided she is in condition to sail. In vessels of considerable value, therefore, like the present, where the charter rate is some $150 per day, the charge for unused days, where a considerable number remain, would become very burdensome. If, for instance, the voyages contemplated occupied from 30 to 60 days each, and at the close of the last voyage only 20 days remained of the charter period, there would be a loss to the charterer of $3,000 for the unemployed days in case he could not send the vessel out on another voyage; and with a larger number of days remaining, the loss would be proportionately greater. It is evident that commercial business by means of chartered vessels could not be carried on under such liabilities to certain loss; and considering that charters like this have been to a large extent long in use, there must of necessity have existed some ways of settlement by which such losses are avoided.

The charterer in the present libels contends that the clause "hire to continue," etc., was designed to provide against this liability and has been so customarily interpreted and applied; that by the charter he has the undisputed right to the beneficial use of the vessel until the expiration of the charter period, and that the intention of this additional clause was to authorize the charterer, up to the expiration of that period, to despatch the vessel upon a voyage in order that he might have the full beneficial use of the vessel during the whole charter term, and pay for any excess of time occupied in finishing that voyage at the rate provided in this clause.

The owner on the other hand contends that the object of this clause was to provide only for an involuntary and unexpected detention of the vessel beyond the charter period, and that this clause gives no right to the charterer to despatch the vessel on a voyage which he knows cannot be completed within the charter term. Steamship Co. Munson (D. C.) 95 Fed. 690, affirmed in 41 C. C. A. 156, 100 Fed. 1005. On the side of the owner, it is urged that it is important for him to know when the charter will expire in order that he may make other engagements for his vessel; that in case of any rise in freights he may at once obtain the benefit of the advance, and finally that the charterer's construction amounts to a material extension of the limits, at the mere option of the charterer. But it is evident that the clause in question does contemplate the detention of the vessel beyond the charter period, since its provision is express that "the hire shall continue from the time specified for terminating the charter until her delivery," etc. As respects the benefit to the owner from any rise in the market rate of freights, the provision that the "hire"—that is, the same rate of hire—"shall continue" operates equally as between the charterer and the owner. When such charters are made neither party knows whether at the close of the charter period, freights will be higher or lower. Had the clause read "hire to be at the market rates after the time specified for terminating the charter until her delivery," one or the other would have obtained the benefit of any change in the market rates. But that would not have shed any light upon the proper construction of the clause itself, as respects the right of a charterer to despatch the vessel on a voyage which would necessarily extend beyond the charter period; so that the provision as to rates has no bearing upon the construction of the clause in question. The provision that the same rate of hire shall continue, should be regarded, therefore, as a method adopted by the parties of avoiding any dispute as to market rates for any excess over the charter period during which the ship might be rightfully employed by the charterer. As respects any new charter of the vessel by the owner, I do not perceive that the difficulties in that regard are materially increased beyond those which commonly exist in the chartering of vessels, since many if not most charters are made while vessels are still engaged upon an unfinished voyage to take effect after arrival. The loss likely to be sustained by the owner from the continuation of the employment of the vessel by the charterer until the close of a voyage commenced during the charter period, through any rise in the market rate of freights is small compared with the loss which in the great majority of cases would certainly be incurred by the charterer, if he had no legal right to despatch the vessel upon a voyage which could not be completed within the charter term.

From the above view of the practical situation of the two parties, and the fact that neither construction of this clause is inconsistent with its language, I think that evidence of the practice, custom or usage as to the employment of vessels under clauses like this is competent, and may be resorted to in order to ascertain the pre-

sumed intention of this clause. 1 Greenl. Ev. § 292; Steamship Co. v. Munson (D. C.) 95 Fed. 690; Insurance Co. v. Sherwood, 14 How. 351, 361, 14 L. Ed. 452; Marx v. Steamship Co. (D. C.) 22 Fed. 680, 684, and cases there cited; Hostetter v. Park, 137 U. S. 30, 40, 11 Sup. Ct. 1, 34 L. Ed. 568.

The evidence of the experts examined, though lacking in precision as to the number of remaining days necessary to authorize an additional voyage, or the precise voyage which might be entered upon, is entirely uniform in stating that the charterer may despatch the vessel upon some of the voyages mentioned in the charter where any considerable period remains of the charter term, although the voyage cannot be completed within the term. These experts were all introduced by the charterer; none were called in behalf of the owner, not even the local agents of the vessel, who are presumably well acquainted with the ordinary practice under charters of this form.

Without commenting upon the details of the different witnesses as respects the custom and practice alleged, but giving full effect to the rule that every custom must be reasonable, I find that where there is an unexpired term of about 12 or 13 days which would involve the charterer in a loss of some $2,000, if the vessel could not be employed by him during that time, that the practice of despatching the vessel upon some of the voyages authorized by the charter is reasonable and is in accord with the established usage of this port and should be allowed. On the other hand, considering that the only justifiable object of any such extension of the time limits of the charter is to enable the charterer to secure the beneficial use of the vessel for the whole charter period, I find that the only additional voyage that can be required of the vessel without the owner's consent, is the shortest of the voyages that are commercially practicable under the charter, or of those in which the vessel has in fact been employed, and for which she was presumptively engaged; and that any custom to despatch the vessel on a longer voyage is unreasonable and invalid, because unnecessary for the objects of the clause in question as respects the charterer, and an unnecessary extension of the time limits of the charter to the owner's prejudice.

In the present case, the steamer being a foreign vessel, could make no voyages between American ports. She had previously made six voyages, two to Cuba and four to Mexico. A voyage to Cuba and return with cargo, would occupy from three to six weeks; to Mexico from eight to nine weeks. To require the vessel to proceed upon the longer of these trips, overrunning the charter period from six to seven weeks, was an unreasonable demand and unjustifiable and ought not to be sustained. The voyage to Cuba, which was finally made, was the shortest of the voyages previously made and the shortest of those contemplated by the charter. Upon the evidence it was, therefore, one which could be reasonably and justifiably required.

I sustain, therefore, the captain's refusal to load for Tampico, and disallow the charterer's claim for extra hire in the employment of another vessel for that port. The loss of four days at Philadelphia

was owing to the charterer's insistence upon the Tampico voyage; there is no indication of delay by the captain to load for Cuba when that voyage was proposed to him, and the deduction of those four days' hire cannot, therefore, be allowed to the charterer. Nor do I find sufficient evidence of delay at 'Cardenas by any fault of the master, and that deduction is, therefore, disallowed. The captain's protest on sailing for Cuba is also overruled, and the recovery of hire for the overrunning days must be computed at charter rates.

The cross libel is therefore dismissed, and a decree may be entered for the libelant in the original libel for the balance of the charter hire only up to the day of delivery, with costs.