MUNSON S. S. LINE v. ELSWICK STEAM SHIPPING CO., Limited.

(District Court, S. D. New York.    June 26, 1913.)

SHIPPING (§ 40*) — TIME CHARTER — TERMINATION — RIGHT OF CHARTERER TO MAKE NEW VOYAGE.

A steamship was delivered in an English port under a charter for "about" six months; charter hire to continue until redelivery, which was required to be in a European port. She carried a cargo from England to Havana and thence proceeded to Mobile, where she loaded a cargo of lumber for Buenos Aires. Owing to unexpected long delays, not due to the fault of either party, she did not reach and complete her discharge at Buenos Aires until more than three weeks after the six months' char-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ter period had expired. *Held*, that the owner was within his rights in refusing to load a cargo for Europe under the charter and in withdrawing the vessel at Buenos Aires, waiving redelivery in Europe.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 40.*]

In Admiralty. Suit by the Munson Steamship Line against the Elswick Steam Shipping Company, Limited. Decree for respondent.

Haight, Sandford & Smith, of New York City (Charles S. Haight. of New York City, of counsel), for libelant.

Convers & Kirlin, of New York City (J. Parker Kirlin and John M. Woolsey, both of New York City, of counsel), for respondent.

VEEDER, District Judge. This is an action by the Munson Steamship Line, charterer of the steamship Elswick Lodge, for breach of charter party. By stipulation of the parties only two of the claims set forth in the libel are presented for determination. The claim for galley coal must be denied upon the decision of the Circuit Court of Appeals of this circuit in the recent case of Dampskibelskabet Ella v. Inter-American Steamship Co. (C. C. A.) 205 Fed. 734. The claim for loss sustained by the charterer by reason of the withdrawal of the Elswick Lodge from the charterer's employment at Buenos Aires is therefore the only item remaining for consideration.

The charter party under which the controversy arises is a government form time charter made at New York on October 9, 1911, by which the owners agreed to let and the charterers agreed to hire the steamship Elswick Lodge from the time of delivery for a period of about three to about six calendar months, at charterer's option. The steamer was to be placed at the disposal of the charterer at Middlesbrough, Hamburg, or in the Tyne, at charterer's option, and was to be employed in such lawful trade as the charterer should direct "between safe port and/or ports in United States of America, and/or West Indies, and/or Central America and/or Carribean Sea, and/or Gulf of Mexico, and/or South America, not south of the River Plate, and/or Europe, and/or Africa, and/or Asia, not east of Singapore, excluding White Sea, Black Sea and the Baltic, Magdalena river, and all unsafe ports; Lulea to be excluded."

The charter contained, among others, the following provisions:

"(4) That the charterers shall pay for the use and hire of the said vessel £(1100) eleven hundred pounds British sterling per calendar month, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a month; hire to continue until her delivery in like good order and condition to the owners (unless lost) at a port in the U. K. or on the continent of Europe between Bordeaux and Hamburg, both inclusive, Rouen excluded, at charterers' option.

" (5) That should the steamer be on her voyage towards the port of return delivery at the time a payment of hire becomes due, said payment shall be made for such a length of time as the owners or their agents, and charterers, or their agents, may agree upon as the estimated time necessary to complete the voyage, and when the steamer is delivered to owners' agents any difference shall be refunded by steamer or paid by charterers, as the case may require."

" (16) That in the event of loss of time from deficiency of men or stores,

breakdown of machinery, stranding, or damage preventing the working of the vessel for more than twenty-four consecutive hours, the payment of hire shall cease until she be again in an efficient state to resume her service; but should the vessel be driven into port or to anchorage by stress of weather or from any accident to cargo, such detention or loss of time shall be at the charterers' risk and expense.

" (17) That should the vessel be lost, freight paid in advance and not earned (reckoning from the date of her loss) shall be returned to the charterers. The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the seas, rivers, machinery, boilers and steam navigation, and errors of navigation throughout this charter party, always mutually excepted."

The steamer was delivered under this charter party to the Munson Steamship Line at Middlesbrough, England, on October 16, 1911, and five days later sailed for Havana with coal. She encountered severe weather and was compelled to deviate from her course and proceed to Corunna, Spain, for repairs. She arrived at Corunna October 29th and spent a week there making temporary repairs. Arriving at Havana November 28th, she discharged her cargo and, on December 10th, left for Mobile, where she arrived four days later. At Mobile she took on a cargo of pitch pine lumber for the River Plate. Encountering the Christmas holidays, 33 days were spent in loading. When at length on January 16, 1912, she sailed from Mobile, she struck an obstruction in the river and was forced to return to her dock for repairs. Twenty-eight days were thus lost. She left Mobile again on February 13th and proceeded to Pensacola for coal. Arriving there on the same day, it was found that, in consequence of the long delay at Mobile, the coal that had been engaged in advance had not been held and there was no coal ready. It was not until February 19th that the ship was able to sail from Pensacola for the River Plate. When the steamer arrived at Buenos Aires, on March 28th, the master served notice that he would not discharge any cargo until the consignees made a deposit of 12 per cent. of the value to protect the owners' claim against the cargo for contribution in general average in connection with the injury sustained by the steamer at Mobile. The deposit was not made by the consignees until late on April 9th. All told, the libelant claims that it thus lost, by no fault of its own, 63½ days between October 16th and April 10th, or a little over two months out of a total of somewhat less than six months. Discharge began on the morning of April 10th and was completed on May 10th. On the latter date the vessel was withdrawn by the owner from the charterer's service pursuant to notice previously given on April 17th; the flat period of six months having expired on April 16th. The owner paid the charterer for all advances made and for coal on board, and made proper deductions from the hire for the time while the vessel was under repairs at Corunna and Mobile, in accordance with clause 16 of the charter.

At this time there had been an extraordinary rise in rates in the neighborhood of the River Plate. After resuming possession, the owner sent the Elswick Lodge to Bahia Blanca in ballast, where she arrived May 14th, loaded a cargo of grain there for England, and

sailed thence on June 5th. She arrived off Sharkness July 12th and finished discharging 10 days later. The homeward voyage with a cargo similar to that contemplated by the charterer thus occupied a period of 97 days beyond a flat period of 6 months, and 73 days beyond the time of the withdrawal of the vessel on May 10th.

The libelant's testimony tends to show that the vessel was chartered for just such a series of voyages as she undertook, viz., Middlesbrough to Havana, Mobile to Buenos Aires, and Buenos Aires to Europe, and that the charter period of about six months was sufficient to allow completion of those three voyages under ordinary conditions of weather and dispatch. According to the statement of the head of the libelant's chartering department, the average time employed under normal conditions for such performance, allowing such time as might be reasonably contemplated both in steaming and in loading and discharging cargo, is 185 days, or two days over a flat period of six months from the date of the steamer's delivery under the charter. Comparing this estimate with the actual home voyage, for example, it appears that, while only 51 days are allowed in the estimate, 73 days were actually consumed. But the libelant properly calls attention to the fact that there is no testimony to show whether this homeward voyage (which, moreover, was not direct but by way of Bahia) was a normal one. The libelant's testimony also tends to show that bringing the vessel from England to this country and then working her to South America necessarily involved a loss to the charterer, and that a vessel which was ready for employment in Europe always received a lower rate than one which was offered on this side, because of the difficulty in obtaining a paying cargo from Europe to the United States.

Upon this evidence the question to be decided is, according to the libelant, whether, in cases of unexpected and unforeseen delays, the owner may invariably construe the charter party as suits his personal advantage. If rates have gone down after delivery of the vessel so that she is worth less to the charterer at the point where she may happen to be at the expiration of the flat period, it is undeniable that the owner may require the charterer to redeliver the vessel in accordance with the charter. May the owner also, when the market has risen, retake possession of the vessel at an intermediate port, thus at his option treating the agreement for redelivery in Europe as binding or not as best suits his advantage in the variations of the market? In answer to this question the respondent refers to the charter party. Whether the charterer has made a successful commercial venture during the term of the charter or not is not pertinent on the question whether he has a right to keep the vessel beyond the term. The charterer asks that he be allowed to keep the vessel two months or more beyond the charter period in order that he may start on a new and profitable adventure. On its face this is unjust to the owner and is permissible only where the charter party contains some clear provision permitting it.

In the nature of things charters for a fixed period involve considerable difficulty because of the uncertainty as to the time voyages are likely to occupy. At the expiration of a fixed term, the charterer is no

longer entitled to possession. If in the employment of the ship he overruns the term, he is certainly liable at the charter rate of freight for the overlap, and, if freights have advanced, to the difference between the market rate and the charter rate in addition. If the last voyage of the vessel terminate so near the expiration of the fixed term that another voyage cannot be made, the charterer either loses that time entirely, or, if he employs the vessel on another voyage, he does so at the risk of being liable for the increase of the market rate of freight for the overlap. Accordingly various provisions have been inserted in charters to cover this contingency. In some cases a clause like No. 4 in the charter in issue has been inserted to cover a possible overlap. In other cases the term was not absolutely fixed, but was rendered flexible by the use of the word "about." Occasionally, as in the present charter, both provisions have been employed. These provisions have been construed in several cases arising in this circuit, and in England, and the principles therein formulated afford, I think, a solution of this controversy.

In Straits of Dover Steamship Co. v. Munson (D. C.) 95 Fed. 690, affirmed 100 Fed. 1005, 41 C. C. A. 156, on opinion below, the steamer was let for "three calendar months from August 1, 1898, to be delivered at Philadelphia and to be employed in carrying lawful merchandise, etc., between any safe ports in the United States, West Indies, Mexico, Cape Verdes, Azores, and for North Coast South America, excluding Brazil, as the charterers shall direct." The charter contained provisions similar to paragraphs 4 and 5 of the charter in issue. The steamer was delivered in accordance with the charter at Philadelphia on August 1st, was loaded with a cargo of coal for Tampico. Mexico, sailed on August 5th, and arrived at Tampico on the 16th. Owing to extraordinary washouts, no berth could be obtained at Tampico until October 5th. Her cargo was discharged on October 18th, and on that day she left for Tuxpam, a short distance south of Tampico, where she arrived on October 19th, to take on a cargo of logs which had been engaged for her return trip in September. The loading at Tuxpam was greatly delayed by bad weather, and the steamer finally left Tuxpam before taking on her entire cargo of logs on December 20th, but was obliged to go to Vera Cruz for bunker coal. On December 27th she left Vera Cruz for Progresso, where between December 29th and January 10th she took on 2,000 bales of hemp. On the latter date she sailed for New York, where she arrived on the 20th, completed her discharge, and was redelivered to the owners on January 24th, 2 months, 23 days, and 8 hours after the expiration of the charter term of three months. After the expiration of the charter period on November 1st, the current market rate for steamers had advanced materially above the charter rate. The libelant demanded payment at the market rate from November 1st.

"The question involved," said Judge Brown, "is reduced to the simple one whether the respondent by the terms of the charter was forbidden to take on a return cargo after the discharge was finished on the 18th of October; there being time only for a return without cargo, if the vessel was bound to reach her return port by November 1st."

After examining the charter provisions 4 and 5, he concluded:

"The reasonable inference as to the intention to be drawn from these circumstances is that the charterer should be authorized to make use of the vessel, at the rate agreed upon, for at least one complete voyage, taking any customary return cargo at the customary ports; and that any prolongation of the charter period in accomplishing the voyage and in taking on a return cargo, not caused through any negligence or lack of diligence of the charterer, or his agent, must be deemed governed by paragraphs 4 and 5 and not subject to any increased rates. I do not see anything in this contract that places the risk of delay through causes beyond the control of the parties upon the one party more than upon the other, either as respects the discharge of the outward cargo or the shipping of the return cargo. Each party takes the risk incident to his contract, and such loss as may incidentally attend it."

The case of Anderson v. Munson (D. C.) 104 Fed. 913, involved a dispute between the owner and charterer as to their respective rights and obligations in regard to the dispatch of a vessel on a new voyage a short time before the close of the time charter. The steamer was chartered:

"For the term of six calendar months from the day of delivery * * * to be employed as the charterers or their agents shall direct in lawful trades between safe ports and/or ports in British North America, between May 1st and September 1st, and/or United States of America, and/or West Indies and/or Central America, and/or Carribean Sea, and/or Gulf of Mexico, and/or South America (not south of River Plate), and/or Europe * * * at the rate of £925 per month, with an option of continuing the charter for a further period of three months and/or three months more upon giving 15 days notice previous to the expiration of the first named term."

The charter also contained a "hire to continue" clause similar to paragraph 4 of the charter in issue. The charterer used both options; and, the vessel having been delivered under the charter on June 7, 1898, the full term of 12 months expired on June 7, 1899. The vessel was not in fact redelivered until July 26th. Meanwhile freights had advanced, and the owner sought to recover compensation at the market rate from June 7, 1899. It appears that on May 25th, the vessel having completed her discharge on a prior voyage, the charterer ordered her to Philadelphia to load a cargo for Tampico, Mexico. The time ordinarily occupied for such a voyage and return was about 60 days, which would overrun the termination of the charter by 74 days. The master proceeded to Philadelphia but refused to load for Tampico. After considerable negotiation the master agreed under protest to load for Cuba, proceeded thither, and returned with cargo after many delays, redelivering the steamer on July 26th, as above stated.

Judge Brown held that the rights of the parties depended upon the construction of the "hire to continue" clause; and, construing that clause in the light of the evidence of custom or usage as to the employment of vessels under such clauses (which was uniform to the effect that the charterer may dispatch the vessel upon some of the voyages mentioned in the charter where any considerable period remains of the charter term, although the voyage cannot be completed within the term), he found that:

"The only additional voyage that can be required of the vessel without the owners' consent is the shortest of the voyages that are commercially prac-

ticable under the charter, or of those in which the vessel has in fact been employed, and for which she was presumptively engaged; and that any custom to dispatch the vessel on a longer voyage is unreasonable and invalid because unnecessary for the objects of the clause in question as respects the charterer and an unnecessary extension of the time limits of the charter to the owners' prejudice. * * * The voyage to Cuba, which was finally made, was the shortest of the voyages previously made and the shortest of those contemplated by the charter. Upon the evidence it was therefore one which could be reasonably and justifiably required."

In the Case of Rygja, 161 Fed. 106, 88 C. C. A. 270, a steamer was chartered for a period of about six calendar months to be employed between (among others) ports in the United States and/or West Indies, and for South America, and/or Europe. The charterers were given the option of continuing the charter for a further period of about six calendar months more on giving a month's notice. There was also the usual "hire to continue" clause, with provision for redelivery "at a United States, Gulf, or Atlantic port, or a port in Europe, at charterer's option." The steamer was delivered in Italy on July 13, 1905. She proceeded to New York, loaded there for South America, thence to the West Indies, thence to New York, where she completed her discharge March 3, 1906. She then loaded for South America, thence to Cuba, thence to New York, where she completed her discharge August 4, 1906. On December 12, 1905, the charterer declared its option for a second term of about six months under the charter provision, and on June 12, 1906, it declared its option to redeliver the steamer in Europe. The master refused to load for a European port, and the charterer brought an action for damages for the withdrawal of the steamer from its use.

"The question is," said Judge Ward, speaking for the Circuit Court of Appeals, "Did the second term begin at the end of the first six calendar months, viz., January 13th, or at the termination of the voyage, March 4th? * * * In this charter the term is not an absolutely fixed period but is 'about six calendar months.' The district judge restricted the effect of the word 'about' to the underlap. Doubtless in a charter containing a clause like No. 4 the word is not necessary because that clause accomplishes the same thing. Still we think the word 'about' applicable to the term whether it be over or under six calendar months, and that, if the last voyage terminate so near the end of the fixed time as to make another voyage unreasonable, the charterer may deliver and the owner may withdraw the vessel, or, if another voyage is reasonable, the charterer may require it at the charter rate of freight. This leaves room for dispute in the case of an underlap as to what voyage is reasonable, but that is a difficulty which cannot be avoided where a fixed term is not agreed upon. In this case, if there were no question of a second term, it could not be denied that the charter terminated March 4th. The charterer having declared its option for a second term, we think the further period began to run from March 4th. * * * In the case before the court, the voyage taken was a usual one, and, as it terminated March 4th, about one month and nine days was left of the second term when the steamship discharged August 24th, and the charterer was entitled to the benefit of its option to redeliver her at a port of Europe."

In the recent case of Trechmann Steamship Co., Ltd., v. Munson Steamship Line (C. C. A.) 203 Fed. 692, in the Circuit Court of Appeals for this circuit, a steamer was chartered for about 12 months in any safe trade, excluding British North America, Baltic, China Sea,

and White Sea, and south of River Plate; and the charter contained provisions similar to clauses 4 and 5 of the charter in issue. The steamer was delivered to the charterer on January 13, 1908, and by it redelivered to the owner on December 15th, 29 days prior to the expiration of a flat period of 12 months. The owner insisted that there was a reasonable time left in which to make a commercially practicable voyage, which the charterer denied. In sustaining the conclusion of the district judge that the charterer had no right to redeliver on December 15th, because a voyage to Cuba and back, the usual time for which would be 43 days, would have been reasonable, the court said:

"The actual employment of a chartered vessel is under the sole control of the charterer. He may employ her as much or as little as he chooses. In the case of a charter for 'about' a stated term, the owner will be sufficiently compensated if he gets the charter hire for the stated term, subject, however, to his right to withdraw the vessel before the expiration of the stated term, if there is not reasonable time enough left for a commercially practicable voyage. * * * [Referring to the court's previous statement in the case of The Rygja, supra:] The libelant erroneously infers from this that we meant not only that the charterer might insist in such case on another voyage but that the owner could require him to make it. The only option the owner has is to withdraw the vessel if a reasonable time is not left to make a voyage commercially practicable under the charter. He will be sufficiently compensated if at that time no such voyage is practicable by getting his vessel back, or if such a voyage is practicable and not ordered by the charterer, by getting the charter hire to the end of the stated term. Because the charterer cannot generally make voyages end at a precise date, it is equitable to construe the word 'about' so that he may get the benefit of the vessel so long as he can reasonably use her under the charter and yet not be obliged to pay hire for time in which he cannot use her at all."

The conclusion is plain from these cases that under a charter party like this the charterer may embark on a voyage during the charter term although it is certain to overlap, provided that the voyage is a reasonable one. If the voyage be reasonable it is compulsory; that is, the charter hire must be paid. If the remaining time is so short that another voyage within the limits prescribed is unreasonable, then the charterer may redeliver or the owner may withdraw the vessel. In this way the charterer gets the benefit of the vessel so long as he can reasonably use her under the charter and yet is not obliged to pay hire for time in which he cannot use her at all, while the owner either gets his vessel back if no such voyage is practicable, or, if it is practicable and not ordered by the charterer, his charter hire to the end of the specified term.

But cases dealing with provisions concerning charter hire do not reach the issue involved in this case, viz., the right of the charterer to start on a new voyage after the expiration of the charter period. This question was not involved in the case of the Straits of Dover, supra. No attempt was made by the owner in that case to withdraw in Mexico when the three months' period expired. The position taken by the owner was that the charterer should return the vessel in ballast to a port of redelivery.

In the case of Bucknall Bros. v. Murray, 5 Com. Cas. 312, however, it was explicitly held that the charterer had no right to start on another

voyage after the expiration of the charter period. There the charter was for a period of about six calendar months, for employment between ports of Europe, Australia, South America, etc., hire to be paid at a specified rate and to continue until the redelivery of the steamer to the owner at a safe port in the United Kingdom or continent (Bordeaux to Hamburg) or in the United States. If redelivered in the United Kingdom or on the continent, the charterers were to pay a penalty of £500. There was a provision similar to clause 5 of the charter in issue, providing that if the vessel was on a voyage at the termination of the period specified the charterers should have the use of her until the completion of the voyage and "in order to bring the steamer to a port of delivery as provided." The steamer was put at the disposal of the charterers at New York on September 21, 1899. She was sent on a round voyage from New York to Cape Town, Calcutta, Colombo, Aden, Suez, and back to New York, where she arrived March 23, 1900, and finished discharging March 28th. On February 15th the charterers had given notice to the shipowner that they intended to load the vessel at New York and redeliver her in the United Kingdom. But the owner replied on February 19th that he should hold the charter to be determined on March 21st, when the flat period of six months terminated, or as soon as the discharge at New York was finished. Pursuant to such notice the owner resumed possession of the steamer on March 28th, and the charterer sued for loss of profits on the proposed voyage from New York to the United Kingdom. Matthew, J., said:

"It was contended on behalf of the plaintiffs that I ought to construe this charter party as covering six months *and* such further time as might be necessary for a voyage to the United Kingdom. To establish that I was referred to clause 39 of the charter party, and it was argued that the charterers were thereby given an option to redeliver the steamer in the United Kingdom and so to continue the hiring until her arrival there. But is that the proper interpretation of the clause? To ascertain what it means I turn to clause 23, which provides for the only case in which there may be an extension of time under the charter party. [His lordship read clause 23.] In the present case the steamer was on a voyage to New York when the six calendar months expired on March 21st. She did not discharge all her cargo in New York until March 28th. But then it is said that the plaintiffs were entitled to send the steamer to the United Kingdom after March 28th, and that the charter party would continue until her arrival there. I cannot discover any indication of an intention in this charter party that such a result should follow. The time of hire is for six months, and it is only if the steamer is upon a voyage at the end of the six months that there is to be any extension of the period under clause 23. To accede to the plaintiffs' view would be to extend the time of hire indefinitely. If before the expiration of the six months the steamer had been free to make another voyage to the United Kingdom, she might no doubt have been sent on that voyage. That was a chance which the plaintiffs had when they entered into the charter party; but it was a chance they could only avail themselves of, provided the steamer was sent on a voyage to the United Kingdom, before the expiration of the six months. In the circumstances of this case, however, the charter party came to an end upon March 28th, and the plaintiffs' case therefore fails."

In the foregoing case, it is true, the vessel was in a port of redelivery at the time of withdrawal. In the later case of The Istok, 6 Com. Cas. 220, however, the vessel was withdrawn under similar circumstances

at the terminus of the outward voyage, as far as possible from the specified port of redelivery. The charter was for 12 months, the hire was to be paid for any part of a month used to complete a voyage and was to continue "until her delivery to owners * * * at a port in the United Kingdom, in charterer's option." The charter period of 12 months ran out on August 12th, and the vessel completed the discharge of an outward cargo at Cronstadt on August 28th. The charterers then claimed the right to send her in ballast to Lulea, as originally contemplated, to load timber for Rotterdam, and thence to Gravesend, to be delivered there to the owners. The owners' refusal to allow this was sustained by the divisional court. Kennedy, J., said:

"Now, assuming that we are to deal with this case upon the footing that 'voyage' in clause 3 of the charter party means or includes a round voyage, I am not of opinion that merely to contemplate the user of a ship by sending her to further ports after she has been discharged at one port without being under any binding agreement to do so can justify the description of such user as a round voyage. A round voyage seems to me to involve an actual round and the returning of the vessel; and to say that where an owner contemplates that, after his ship has discharged at one port, he will send her on some other engagement, the ship is on a round voyage is a proposition with which I, as at present advised, do not agree. In my opinion the outward voyage in this case was ended at Cronstadt, and after that a further voyage would be a fresh voyage. The owners said that they were willing to waive the question of the charterer having to redeliver the vessel in the United Kingdom, and that they would take delivery at Cronstadt. I think that it was within their power to do that; but it was contended on behalf of the charterer that, as there was a duty on him to redeliver in the United Kingdom, there must be read into the charter party an implied condition in his favor that, although the voyage to Cronstadt was ended and the 12 months had expired, he might commence at Cronstadt a voyage which he contemplated as advantageous from a business point of view and which would ultimately, though not directly, bring the vessel to the United Kingdom with a cargo. I can find nothing in the language of the charter party to justify such a contention, and the result of adopting that view would be that the shipowner would never know when he would get redelivery of the vessel. It is said that in this particular case, if the contemplated voyage had been carried out, the ship would have arrived in the United Kingdom within one month after the contract time; but, if the argument is correct, the charterer's right must equally exist if she would not have arrived till after the month. As long as the 12 months are running, the charterer had the right to commence a new voyage, but, once the 12 months had expired, any prolongation of the period for a new adventure renders it quite uncertain when the shipowner is going to get his ship, and that seems to me to be very objectionable from a business point of view."

This judgment was affirmed by the Court of Appeal. 7 Com. Cas. 190. Clause 3, said Vaughan Williams, L. J., "gives the charterers the right of completing a voyage, which has been begun before the expiration of the 12 months, but which has not been terminated within that period. But that is not what the charterer proposed to do in this case." Two of the three judges composing the court expressly reserved judgment on the question whether in such a charter party the expression "voyage" might not include the return of the ship, with cargo, direct to the United Kingdom; and also the question as to whether the clause providing for the redelivery of the ship in the United Kingdom was solely for the benefit of the ship owners. So far

as the latter question may be involved in the determination of the issue here, I concur in the conclusion reached by Mr. Justice Kennedy. The libel is dismissed.