## THE B. F. BRUCE.

### LUMBERMEN'S MIN. CO. v. GILCHRIST et al.

*(Circuit Court, N. D. Ohio, E. D. December 30, 1891.)*

1. CHARTER-PARTY—UNQUALIFIED OBLIGATION—EFFECT.

Unqualified charter-parties are to be construed liberally as mercantile contracts, and a party who has by charter charged himself with an obligation must make it good, unless prevented by the act of God, the law, or the other party to the charter.

2. SAME.

Respondents, ship-owners, entered into an absolute agreement with libelant, by charter, that they would, during a season of lake navigation, carry eight cargoes of libelant's iron ore from one port to another in a specified vessel, to be towed by another specified vessel. Two of the eight trips were not performed, and libelant employed other vessels at an advanced freight, and brought this suit to recover the difference of freight between the charter rate and the rate they were obliged to pay. Respondents averred that, after it appeared that the designated vessel could not make the eight trips, they had offered to supply other towage, which offer libelant refused. Also, that during the existence of the charter, one of the specified vessels was at times detained by other business. *Held*, that respondents, having by their charter entered into an unqualified undertaking possible to be performed, must make it good, unless performance was rendered impossible by the act of God, the law, or by the libelant, and hence that libelant was entitled to recover.

In Admiralty. Suit to recover damages for breach of charter. On appeal from district court. Affirmed.

*Harvey D. Goulder*, for appellants.

*Henry S. Sherman*, for appellee.

JACKSON, Circuit Judge. The libel in this case was filed to recover the damages which libelant claims to have sustained by reason of respondents' breach of a certain contract of affreightment made and entered into between the parties in February, 1886. The district court found that respondents had failed to perform their contract, and, after a reference to and report by a special master as to the damages thence resulting, gave a decree in favor of libelant against respondents for the sum of $2,203.20 and costs. From said decree respondents prosecute the present appeal.

It appears from the pleadings and proofs that on February 4, 1886, respondents addressed to J. H. Outhwaite & Co., agents of libelant, the following proposition:

"We will transport for you 30,000 tons of iron ore from the port of Escanaba, Michigan, to Lake Erie ports, (not east of Erie,) in equal monthly quantity, during the season of navigation of 1886, at the rate of ($1.00) one dollar per gross ton, steam tonnage."

Libelant, through its said agents, accepted the proposition February 9, 1886; its written acceptance being accompanied with a designation of the boats which were to be employed by respondents, as follows: "We accept charter of schooner B. F. Bruce dated February 4 to apply on above [contract;] also charter February 4 with schooner Teutonia; also charter Mch. 23 with schooner S. H. Foster." Thereupon, and in conformity with said accepted proposition, the following formal written agreement was made and entered into between the parties, viz.:

"Vessel charter. Agreement between J. C. Gilchrist, of Vermillion, Ohio, as managing owner of the vessel called the B. F. Bruce, and J. H. Outhwaite & Co., of Cleveland, Ohio, as agents for Lumbermen's Mining Company, made at Cleveland, O., this 4th day of February, 1886: Witnesseth, that the said J. C. Gilchrist, for the considerations hereinafter named, hereby agrees that said vessel shall carry eight (8) cargoes of iron ore for the said J. H. Outhwaite & Co., agents, during the season of 1886, from Escanaba, Mich., to Lake Erie ports, (not east of Erie,) at a rate of freight of one dollar ($1.00) per ton of 2,240 pounds. It is understood that the above number of trips shall be distributed through the season of navigation 1886 as equally as possible in regard to time. It is also understood that the said vessel shall be constantly towed by the prop. N. K. Fairbanks during the life of this contract. There shall be allowed an average of four days' time for loading said vessel, and for furnishing a dock at which to discharge; the time to be reckoned from the hour when said vessel reported and was ready to load until loaded, and from the time when reported at port of destination and was ready to unload until a dock was furnished; the time of such reporting, in both cases, not to date from an hour earlier than eight o'clock A. M., or later than five o'clock P. M., Sundays, public holidays, and time lost in consequence of heavy seas, strikes, or any other cause beyond the control of Lumbermen's Mining Co., excepted. When each cargo contracted by this vessel is delivered, if it shall be found that the time of detention exceeds four days for each trip, as above stipulated for, the said vessel shall be allowed a compensation for further detention, except for causes above stated, at the rate of five cents per gross ton of one average cargo for each day (of 24 hours) of such excess. The time of reporting, ready to load, and when loaded, with causes of detention, if any, shall be noted on the bill of lading in every instance. A special order for each cargo shall be obtained from the agents of said Lumbermen's

Mining Company at Cleveland. Said J. H. Outhwaite & Co., agents, in consideration of the above, hereby agree to employ said vessel, and agree to pay the freight, as above mentioned.

"J. C. GILCHRIST, Manag. Owner.
"LUMBERMEN'S MINING CO.,
"By J. H. OUTHWAITE & Co., Agts."

The schooner Bruce, mentioned in said contract, belonged to respondents, and J. C. Gilchrist was her managing owner. The steamer Fairbanks was under the control of respondents, as charterer or owner, for the season of 1886. Said Gilchrist and J. H. Outhwaite & Co., agents of libelant, both have offices at Cleveland, Ohio, where said contract was made. The average cargo of the schooner Bruce was 1,360 tons. She carried during the season of navigation of 1886 six cargoes of iron ore for libelant from Escanaba, Mich., to Lake Erie ports, (not east of Erie,) for which the stipulated price of one dollar per ton was paid as each trip was made. She failed to make two of the eight trips which respondents undertook and agreed she should make during said season. When it became evident that she would fall short in making the eight trips stipulated to be performed, libelant, during the month of November, 1886, while navigation for the season was still open, employed other tonnage, to the amount of about 2,700 tons, in place of the Bruce, to transport its iron ore from Escanaba, Mich., to Lake Erie ports, (not east of Erie,) for which it was required and compelled to pay freight at the average rate of $1.81 per ton of 2,240 pounds.

The failure of the schooner Bruce to carry two of the eight cargoes of iron ore agreed to be carried is the breach of contract set up by libelant, and the damage which it claims as resulting therefrom is the difference between the contract price of $1 per ton, to be paid respondents, and $1.81 per ton, which libelant had to pay for other tonnage to supply the place of the Bruce. This difference, amounting to $2,203.20, was awarded and decreed to libelant by the district court. Respondents admit that the Bruce failed to carry two of the stipulated cargoes before the close of navigation in 1886, but set up by way of avoidance several matters of excuse or defense. They aver that during said season the Bruce was subjected to great and unwarranted delays in obtaining libelant's cargoes at Escanaba, and in discharging the same at destination or ports of delivery, contrary to the understanding of all parties that said vessel was to receive from libelant good dispatch in loading and discharging its cargoes, in order that she might accomplish the eight trips agreed to be made. The proof wholly fails to sustain this defense, which was not seriously insisted upon at the hearing, and need not be further noticed.

The next special matter of avoidance is thus stated in the answer:

"Respondents further aver that, after the Bruce had accomplished several trips, it became apparent that, owing to the great delay to which the vessels were subjected in handling cargoes, she would probably be unable to perform eight trips; that up to about September 1st freights on ore were low, and during July, August, and September both libelant and respondents could have obtained other tonnage at or below the charter rate of freight; that fre-

quently during these months respondents pointed out to libelant the evident inability of the Bruce to perform eight trips, and offered to put in other tonnage to make good the deficiency; and they also called the attention to the requirement in the charter that trips be equally distributed throughout the season, and that the Bruce, owing to delays, was falling behind; that respondents then had other tonnage, which they were ready and willing and offered to put in to equalize the number of trips, but libelant refused to employ other tonnage itself, or to permit respondents to put in other tonnage, although between July 13th and October 2d the Bruce, without fault on her part, was able to deliver but one cargo; that, had the libelant permitted the respondents to furnish other tonnage, as they were ready and willing and offered to do, there would have been no loss to either libelant or these respondents."

It is shown by the proofs that some time in August, 1886, respondent Gilchrist had some conversation with Mr. Pollock, of the firm of J. H. Outhwaite & Co., agents for libelant, about putting in other tonnage in place of, or in addition to, the Bruce. Mr. Gilchrist fixes the date of said conversation "in the fore part of August." Mr. Pollock does not remember the time in August at which the interview took place. The offer or suggestion to put in other or substitute tonnage in place of or additional to the Bruce was declined by Mr. Pollock, on the ground that the said schooner had carried her full quota or proportion of cargoes up to that time, and respondents were not entitled to put in, nor libelant under any obligation to accept, extra tonnage, for which it might not be ready, or which might have conflicted with its engagements. Gilchrist appears to have thought that the Bruce was falling behind, if, as he assumed, the season of navigation was counted from April 1 to November 30, 1886. Pollock, however, reached the conclusion that the Bruce was not behind in her trips by taking the season at seven months, and figuring on the 30,000 tons which the three schooners were to transport; it being the understanding of the parties, as admitted in the answer of the respondents, that the Bruce was put in to apply on said contract, by the terms of which said 30,000 tons of ore were to be carried, "in equal monthly quantity, during the season of navigation of 1886." When the season of navigation actually opened in 1886 does not distinctly appear from the proof, but it does appear that the Bruce loaded her first cargo of ore, under the contract, on May 8, 1886, which we may assume was the opening of navigation for her; and, estimating her trips from May 6, 1886, when she first reported at Escanaba for loading, her season of navigation, running to November 30th, covered a period of seven months, on the basis of which Pollock figured, to show that the Bruce was not behind in August, when the request or offer to put in extra tonnage was made by Gilchrist. If this was not so, still repondents could not avail themselves of the failure of the Bruce to carry one cargo in April, on the theory that the season of navigation opened April 1, 1886, and require libelant to accept other or extra tonnage in August, 1886. But, aside from this, the request or offer to put in additional tonnage was not insisted upon by Gilchrist, and the Bruce proceeded with her trips, and with such slow dispatch that she failed to make two of the stipulated eight trips.

The theory upon which counsel for respondents urge the offer of other tonnage in August as a defense is that the charter-party sued on, when read in the light of the accepted proposition of February 4, 1886, to transport 30,000 tons, "in equal monthly quantity, during the season of navigation of 1886," should be regarded or construed as a severable contract for eight separate monthly trips. The contract does not admit of this construction without totally disregarding its terms; but, if it did, it is not perceived how, or in what way, it could operate to make the offer of other tonnage in August a defense for the Bruce's failure to carry the two cargoes as agreed.

It is next urged that, inasmuch as the steamer Fairbanks was mutually selected by the parties as the means or instrument for towing the schooner Bruce to enable her to make the eight trips, and inasmuch as the Fairbanks, by reason of other engagements, and on account of detentions by other parties at the ports of Ashland and Chicago, was unable to make the eight trips to Escanaba, the respondents are therefore excused or relieved from liability. This position cannot be sustained. By the original proposition to transport 30,000 tons of ore, respondents offered steam tonnage for the vessels which were to carry the ore. By the charter-party sued on, they name or designate the schooner Bruce as the vessel which is to carry eight cargoes during the season of navigation, and expressly stipulated that she shall be constantly towed by the propeller Fairbanks, (respondents controlled both the Fairbanks and the Bruce,) and they put both into the service they agreed to perform for the price of one dollar per ton, to be paid by libelant. It is shown by the proof that libelant required that the respondents should provide steam tonnage, and this respondents agreed to furnish. In accepting the Bruce and Fairbanks as the vessels thus to be furnished and provided by respondents, it cannot be properly said that they, or either of them, were so mutually selected by the parties as that libelant should in any way be chargeable or responsible for the acts, defaults, or failures of either or both to perform the stipulated trips. The terms and provisions of the charter-party admit of no such construction. The libelant was a mere contractor for a designated service, which respondents undertook and agreed should be performed by the designated vessels, whose use and navigation they controlled. In permitting respondents to put in the Bruce and Fairbanks to apply on the contract to transport the 30,000 tons of ore, libelant incurred no responsibility for the failure of either of said vessels; and it would be an entire perversion of the true intent and meaning of the contract to say that libelant should, equally with respondents, bear the consequence of the Fairbanks' neglect, refusal, or failure to perform the stipulated service.

In connection with this defense, counsel for respondents contend that libelant or its agents knew that respondents intended to employ both the Fairbanks and the Bruce in the carrying trade during the season between Ashland and Chicago, and from the latter place to Escanaba, and thence to Lake Erie ports, (east of Erie,) and that libelant should be held to have taken the chances and consequences of detentions at Chi-

cago and Ashland in making such triangular trips. It does not appear that libelant or its agents, when the offer to transport 30,000 tons of ore was made and accepted, had any knowledge or notice that the steamer or propeller which might be employed by respondents to tow the Bruce was to have any other engagement. About the time of designating the Fairbanks as the propeller to tow the Bruce, the agents of libelant were informed that respondents intended to employ said propeller in making said triangular trips; but it was intimated, when she was named in the charter-party to apply on the original contract, that she could make with the Bruce the eight trips which the respondents agreed to perform during the season of navigation, and on the basis of that estimate respondents entered into an absolute and unconditional agreement that the Bruce should carry eight cargoes of ore for libelant.

Upon what principle of law or rule of construction is respondents' unqualified undertaking to perform a specific and designated service for libelant with two named vessels, within a given time, subject to the contingency of said vessels performing other engagements which respondents may or might enter into with other parties? The proposition asserted is substantially this: that libelant should be held to have taken the risk of the Fairbanks' performing the triangular service or engagements which respondents had or might enter into for her, and if she was unable, by reason of detentions at Ashland and Chicago, occasioned by accident or the fault of the other parties, to make the eight stipulated trips, that libelant must bear the consequence of her failure. This is radically unsound, and wholly unsupported by authority. Charter-parties like the present are to be construed liberally, as mercantile contracts usually are, in furtherance of the real intention of the parties; and the respondents, having by this undertaking charged themselves with an obligation or service possible to be performed, must make it good, unless performance was rendered impossible by the act of God, the law, or by the libelant. Unforeseen difficulties or obstacles, however great, will not excuse them. They should have been guarded against by express conditions or qualifications in the contract.

In the case of *Antola* v. *Gill*, 7 Fed. Rep. 489, Chief Justice WAITE held that a vessel delayed in the performance of a new contract, because she was bound by and engaged in fulfilling an old one, furnished no excuse. Time was of the essence of the charter-party sued upon. *Lowber* v. *Bangs*, 2 Wall. 728; *Norrington* v. *Wright*, 115 U. S. 203, 6 Sup. Ct. Rep. 12; and *Filley* v. *Pope*, 115 U. S. 213, 6 Sup. Ct. Rep. 19, and cases therein cited. For this failure to carry two cargoes of ore respondents are responsible to libelant. The damages sustained have been correctly ascertained and fixed at the sum of $2,203.20.

The decree below is affirmed, without interest, but with costs of suit in this court and the court below, to be taxed against respondents. Let judgment be entered accordingly.