LUMBERMAN'S MIN. CO. v. GILCHRIST et al.

(Circuit Court of Appeals, Sixth Circuit. May 1, 1893.)

No. 37.

1. SHIPPING—CHARTER PARTY—ABSOLUTE CONTRACT.

A charter party provided that the vessel should carry eight cargoes of iron ore from Escanaba, Mich., to Lake Erie ports, during a certain season; the vessel to be constantly towed by a specified propeller, and the eight trips to be distributed through the season of navigation as equally as possible. The vessel, however, only made six trips, and the shipper sued to recover advanced freight, which he was compelled to pay for the transportation of the other two cargoes by other vessels. *Held* that, as defendants' undertaking was an absolute one, they were liable, notwithstanding that the propeller named was not under their control, and had been previously engaged to make a triangular trip to Chicago in connection with each trip from Lake Erie ports to Lake Superior, and that this fact was known to the agent of the shippers when he made the contract for them. 50 Fed. Rep. 118, affirmed.

2. SAME—DEFENSES.

The shipowners were not relieved of liability by the fact that in August they tendered other tonnage to make up an anticipated default of the chartered vessel, it appearing that navigation did not open for that season until the 1st of May, and that in August the chartered vessel was only a few days behind in her trips, according to the equal distribution of the eight cargoes during the season, as provided for in the charter; and that her defaults occurred later in the season, at which time her owners made no tender of additional tonnage. 50 Fed. Rep. 118, affirmed.

3. SAME—MEASURE OF DAMAGES.

Under these circumstances, the measure of damages was the difference between the freight as fixed in the charter party and the freight actually paid for the transportation of the cargoes which the chartered vessel failed to carry. 50 Fed. Rep. 118, affirmed.

Appeal from the Circuit Court of the United States for the Northern District of Ohio.

In Admiralty. Libel in personam for breach of charter party. In the district court a decree was rendered for libelant, which was affirmed by the circuit court on an appeal thereto. 50 Fed. Rep. 118, affirmed. The respondents appeal. Affirmed.

Harvey D. Goulder, (F. H. Canfield, of counsel,) for appellants.
Henry S. Sherman, for appellee.

Before TAFT, Circuit Judge, and SAGE and SWAN, District Judges.

TAFT, Circuit Judge. This is a libel in personam against J. C. Gilchrist, R. E. Schuck, William H. Gilcher, Louis Woodruff, Myra Lavoo, and L. H. Weeks, owners of the schooner B. F. Bruce, for breach of the following contract:

### "Vessel Charter.

Agreement betwen J. C. Gilchrist, of Vermillion, Ohio, as managing owner of the vessel called the B. F. Bruce, and J. H. Outhwaite & Co., of Cleveland, Ohio, as agents for Lumberman's Mining Company, made at Cleveland, Ohio, this 4th day of February, 1886. Witnesseth, that the said J. C. Gilchrist, for the considerations hereinafter named, hereby agrees that said vessel shall carry eight (8) cargoes of iron ore for the said J. H. Outhwaite & Co., agents, during the season of 1886, from Escanaba, Michigan, to Lake Erie ports, (not east of Erie,) at a rate of freight of one dollar ($1.00) per ton of 2,240 pounds. It is understood that the above number of trips shall be distributed through the season of navigation of 1886 as equally as possible in regard to time. It is also understood that the said vessel shall be constantly towed by the propeller N. K. Fairbanks, during the life of this contract. There shall be allowed an average of four days' time for loading said vessel, and for furnishing a dock at which to discharge; the time to be reckoned from the hour when said vessel reported and was ready to load, until loaded, and from the time when reported at port of destination, and was ready to unload, until a dock was furnished. The time of such reporting in both cases not to date from an hour earlier than 8 o'clock A. M. or later than 5 o'clock P. M.; Sundays, public holidays, and time lost in consequence of heavy seas, or any other causes beyond the control of Lumberman's Mining Company, excepted. When each cargo contracted by this vessel is delivered, if it shall be found that the time of detention exceeds four days for each trip, as above stipulated for, the said vessel shall be allowed a compensation for further detention, except for causes above stated, at the rate of five cents per gross ton of one average cargo for each day (of twenty-four hours) of such excess. The time of reporting, ready to load, and when loaded, with causes of detention, if any, shall be noted on the bill of lading in every instance. A special order for each cargo shall be obtained from the agents of said Lumberman's Mining Company, at Cleveland. Said J. H. Outhwaite & Co., agents, in consideration of the above, hereby agree to employ said vessel, and to pay the freight as above mentioned.

"J. C. Gilchrist, Managing Owner.
"Lumberman's Mining Co.
"By J. H. Outhwaite & Co., Agents."

The libel averred that but six cargoes of iron ore were carried during the season of navigation of 1886 by the respondents, and that the libelant was obliged to and did charter other vessels to bring the two other cargoes of iron ore from Escanaba to Cleveland at the rate of $1.72 per ton of 2,240 pounds. The respondents admitted the charter, and that the Bruce did not carry eight cargoes, but averred in defense that it was known to both the parties to the charter that the steamer Fairbanks was chartered during that season to make trips from Lake Erie to Lake Superior, thence to Chicago, and thence to Escanaba, and from there to Lake Erie ports; and the number of trips the Bruce could make was known and understood to depend on the number of trips the propeller Fairbanks made. That the respondents well and truly performed the contract, be-

cause the Bruce was constantly towed by the propeller Fairbanks, and remained steadily in the employ of the libelant during the season, and accomplished all the trips for libelant that it was possible for a schooner so towed to make during the season of 1886. The answer also charged that the Bruce had been subject to great and unwarranted delays in obtaining libelant's cargoes, whereby she was prevented from making the trips specified in the contract. Further, the respondents averred that after the Bruce had accomplished several trips it became apparent that, owing to the great delay to which the vessels were subjected in handling cargoes, she would be unable to make the entire eight trips. That the respondents frequently pointed out to the libelant the evident inability of the Bruce to make eight trips, and offered to put in other tonnage to make good the deficiency. That they then had other tonnage which they were ready and willing to put in to equalize the number of trips, but the libelant refused to employ other tonnage, or to permit the respondents to put in other tonnage; and that, if this other tonnage had been permitted, there would not have been any loss to either libelant or respondents.

There is no evidence whatever to support the averment of the answer that the libelant company had delayed respondents' vessel in loading beyond the time allowed for this purpose in the contract. We think equally untenable the contention of counsel for the appellant that, under the contract, and the circumstances surrounding it, the appellant should not be held responsible for the delays of the steamer Fairbanks on the ground that she had been named in the charter with the consent of the Mining Company, as the vessel to tow the Bruce thereunder.

The evidence disclosed that the parties had made a contract on the 4th of February, 1886, as follows:

"Outhwaite & Co., Agents of the Lumberman's Mining Co.: We will transport for you 30,000 tons of iron ore from the port of Escanaba, Michigan, to Lake Erie ports, not east of Erie, in equal monthly quantity, during the season of navigation, 1886, at the rate of one dollar per gross ton, steam tonnage.
[Signed] "Moore, Bartow & Gilchrist."

This was accepted by the mining company per Outhwaite & Co., February 9, 1886, and thereafter the parties met for the purpose of naming the vessels under which this contract was to be performed, and signed the charter herein. This notation was made on the contract by libelant: "We accept charter of schooner B. F. Bruce to apply on this contract." In making the charter the Fairbanks was named by Gilchrist as the steam vessel to tow the Bruce, and the name of that propeller was accordingly inserted therein.

Taking the original contract and the charter together, it is perfectly clear that the respondents are responsible for the Fairbanks' delays, because they stipulated to carry the iron ore by steam tonnage. It is wholly immaterial whether the Fairbanks was under the control of the respondents or not. The contract was that the Bruce should make eight trips in tow of the Fairbanks. It was, therefore, the contract of the respondents that the Fairbanks should make eight trips. There is no reason why one may not contract

with another that a third shall do a stipulated work. The circumstance that Pollock, who negotiated the contract for the mining company, may have known that the Fairbanks was chartered to some one else, and may have known that the Fairbanks was going to take a triangular trip to Chicago in connection with her trips from Lake Erie ports to Lake Superior, cannot affect the unqualified obligation of the contract into which the respondents entered that the Bruce should make eight trips between Lake Erie ports and Escanaba, during the season of navigation, in tow of the Fairbanks. It would be unheard of to ingraft a condition of the character suggested on a contract so explicit in its provisions. If the parties had wished to make their obligation to perform eight trips with the Bruce conditional on prompt navigation by the Fairbanks, they should have expressly so stipulated. Even if we could consider all the oral evidence offered upon this point, we have no doubt whatever that the intention of the parties was exactly expressed in the contract.

Coming now to the third defense, based on Gilchrist's tender of extra tonnage, we are of opinion that libelant was not obliged to accept the offer when made. The trips made by the Bruce were as follows: She reported at Escanaba on the 6th of May, and she delivered her first cargo so as to be paid for it on the 14th of May. She reported again at Escanaba on the 7th of June, and finished loading on the 8th. The time when she arrived at Cleveland does not appear. She reported ready to load again at Escanaba on the 13th of July, and finished loading on the same day, and collected her freight at Cleveland on the 21st of July. She reported again at Escanaba on the 18th of August, finished loading on the 19th, and collected her freight the 24th of August at Cleveland. She was ready to load again at Escanaba on the 28th of September, was loaded on the 29th, and it does not appear when she reached Cleveland. She was ready to load at Escanaba on the 31st of October, finished loading on the 1st of November, and collected her freight on the 10th of November. The 30,000 ton contract provided that the ore should be delivered in equal monthly installments. The charters subsequently made provided for the distribution of eight cargoes as equally as possible through the season of navigation. It is quite probable that the parties hoped that the season of navigation would begin on the 1st of April, and that the eight cargoes might be distributed through eight months. As a matter of fact, the season of navigation did not begin until the 1st of May, so that it was seven months instead of eight. In this result we think that the construction of the contract should be that the eight cargoes were to be distributed over the actual season of navigation, equally; and that it was a compliance with the contract for the respondents to furnish their first vessel in May. If we are right in this, then, dividing the time between the 1st of May and the 30th of November, 214 days, by 8, we find that the trips, if distributed with exact equality, would be 26¾ days each. The third trip was completed on the 21st of July, 82 days after the opening of the season of navigation, or but 2 days after the third trip should have

been completed if each trip had been made in 26¾ days. Gilchrist says that in the first part of August he went to Pollock, who represented the libelant, and asked to have the privilege of putting in some other tonnage for the Bruce, but Pollock would not permit it, because, he said, they were carrying their ore as fast as they were entitled to it. When the conversation with Pollock was had, therefore, there had been no such falling behind that libelant could then be required to accept extra tonnage. The fourth trip was completed on the 24th of August, or nine days after it should have been completed to make the trips exactly equal. This certainly gave no right to Gilchrist to put in another cargo in August, as he wished to do. His defaults were later,—at a time when freights were higher. Gilchrist did not propose to put in new tonnage for September, October, or November, and the August tender did not relieve him from the obligation he was under of making the other four trips after the 13th of August at periods as nearly equal as possible. There is no attempt to show that at the time when Pollock might reasonably have anticipated a failure on Gilchrist's part to make the eight trips he could then have obtained tonnage at a less rate than he did afterwards obtain it to be put in during the months of October and November,—the months in which the delinquencies occurred.

Finally, as to damages, the same question is raised that has already been considered in the case of The Oregon v. Iron Co., 55 Fed. Rep. 666, (decided at this term.) Under the circumstances here the proper measure of damages was the difference between the freight as fixed in the contract and the freight actually paid on the cargoes which were shipped to take the place of the two cargoes which the Bruce failed to carry. The district court adopted this measure of damages, and its decree was affirmed by the circuit court. The decree of the circuit court is therefore affirmed, with interest, at the cost of the appellant.