## THE THEMIS.

### (District Court, S. D. New York. May 28, 1917.)

1. SHIPPING ⚖➟40—CONSTRUCTION OF TIME CHARTERS—PROVISION AGAINST OVERLAP.

The owner chartered a steamship to a Canadian company for nine consecutive seasons beginning in the spring each year and hire to continue until her redelivery at Philadelphia or Baltimore between December 15th and January 5th. The owner later made a complementary charter to libelant for the winter seasons, the steamer to be delivered at Philadelphia or Baltimore at owner's option "upon redelivery by" the Canadian company between December 15th and January 5th each season as called for by its charter. *Held*, that the undertaking by the owner to deliver the ship under such charter was not contingent upon her redelivery by the Canadian company, over which libelant had no control, but that the owner assumed responsibility for such delivery with the right to call upon the first charterer for any default. *Held*, further, that the margin of 20 days given the first charterer and the owner under libelant's charter for redelivery was intended to cover any "overlap" which pending voyages of the vessel might require.

2. SHIPPING ⚖➟56—CHARTER—LIABILITY FOR BREACH.

The Canadian company subchartered the steamer one season for eight months; hire to continue until her redelivery to the owner north of Hatteras "not later than January 1, 1916." On September 12, 1915, over the protest of the original charterer, the subcharterer started the vessel on a voyage from New York to New Zealand and Australia. On her arrival at Colon the canal was found closed indefinitely on account of slides, and on October 5th she proceeded on her voyage around the Cape, with the result that she was not redelivered to the owner until May 5, 1916, after libelant's charter term for that season had expired. *Held*, that the subcharterer was not entitled to any overlap for completion of the voyage beyond that allowed for in the original charter, which required redelivery unconditionally by January 5th; that, having elected to proceed with the voyage from Colon, with the certainty that it could not be completed within the charter term, the subcharterer became primarily, and the owner secondarily, liable, for the damages caused by the breach of libelant's charter.

3. SHIPPING ⚖➟52—CHARTER—BREACH BY CHARTERER—"PREVENTION" OF REDELIVERY.

To relieve a charterer from liability for failure to surrender the ship within the time limited by the charter, there must have been physical "prevention" of the return by some cause excepted in the charter, except perhaps in case of an exception against strikes. The risk of the enterprise under the charter is his, and not the owner's, and mere financial loss to him, however serious, which would result from his keeping his contract will not justify him in breaking it without compensating the owner or a succeeding charterer for any loss which results from the breach.

---

⚖➟For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
244 F.—35

In Admiralty. Suit by the Gans Steamship Company against Wilhelm Wilhelmsen and a Norwegian corporation, as owners of the steamship Themis, Nova Scotia Steel & Coal Company, Limited, and Barber & Co., Incorporated, impleaded. Decree for libelant.

This proceeding was commenced by the filing of a libel in personam by the Gans Steamship Company against Wilhelm Wilhelmsen and a Norwegian corporation, as owners of the steamer Themis, for breach of a charter party entered into on March 24, 1910, the contents of which will be stated hereafter. It sought damages for the failure of the owners to deliver the Themis under the charter party on or before January 5, 1916. The libel was filed on January 17, 1916, and on April 17, 1916, Wilhelmsen and the Norwegian corporation filed a petition under the fifty-ninth admiralty rule (29 Sup. Ct. xlvi) impleading the Nova Scotia Steel & Coal Company, Limited, under a charter entered into March 21, 1910, between the owners and that company, under which they were obliged to deliver the Themis at Baltimore between December 16th and January 5th of each year. The owners alleged that any default of theirs under the charter party between themselves and the Gans Steamship Company was due to this default of the Nova Scotia Steel & Coal Company, Limited, for which the latter was responsible. On May 6, 1916, the Nova Scotia Steel & Coal Company, Limited, in its turn impleaded Barber & Company, Incorporated, likewise under the fifty-ninth admiralty rule, by virtue of a charter party entered into between the Nova Scotia Steamship Company and Barber & Co., Incorporated, on the 31st day of March, 1915, by which they had sublet the Themis to Barber & Co. for a period of eight months. Each of the parties severally impleaded made answer to the petition filed against them. The answers of Barber & Co., Incorporated, and the owners allege that, owing to the closing of the Panama Canal by slides in October, 1915, the Themis was prevented from making her voyage already undertaken and from returning within the time stipulated. It is unnecessary to state at greater length the contents of the pleadings.

The facts are as follows: On March 21, 1910, the owners of the Themis made a charter to the Nova Scotia Steel & Coal Company, Limited, for nine successive seasons, of which the important parts are as follows:

"(1) That the said owners agree to let and the charterers agree to hire the said steamship for the term of *nine consecutive seasons* [underscored words in writing] from the day of her delivery, she then being placed * * * at the disposal of the charterers at Wabana not before April 1st or later than 15th of May (or charterers to have option of canceling this charter), * * * to be employed in any safe trade between ports in B. N. A., United States, West Indies, Central America, Caribbean Sea, Gulf of Mexico, South America, Europe, Africa, Asia, Australia or New Zealand as charterers or their agents shall direct."

"(4) That the charterers shall pay for the use and hire of the said vessels at the rate of £2,031.5 per calendar month, * * * hire to continue from the time specified for commencing the charter until her redelivery to the owners (unless lost) at Philadelphia or Baltimore *between December 15th and January 5th at charterer's option* [in writing]."

"(21) * * * The act of God, the king's enemies, loss or damage from fire on board in hulk or craft, or on shore, arrest or restraint of princes, rulers and people, collisions, any act, neglect, or default whatsoever of pilot, master, or crew in the management or navigation of the ship, and all and every danger and accident of the seas, canals, and rivers, and of navigation of whatever nature or kind always excepted."

On March 24, 1910, the owners concluded a charter with the Gans Steamship Company for the Themis, of which the important parts are the following:

"(1) That the said owners agree to let and the said charterers agree to hire the said steamship from the time of delivery for *nine consecutive winter seasons* [in writing], steamer to be placed at the disposal of the charterers at Philadelphia or Baltimore at owner's option upon redelivery by the Nova Scotia Steel & Coal Company between December 15th and January 5th each season as called for by charter arranged for the steamer between owners and the

Nova Scotia Steel & Coal Company covering nine consecutive Wabana seasons commencing 1911, * * * in such lawful trades between safe port and ports in B. N. A. or United States or West Indies or Central America or Caribbean Sea, Gulf of Mexico, South America, Europe, Mediterranean Africa, Northern Africa," etc.

"(5) That the charterer shall pay for the hire and use of said vessel £1,562.-10 a month * * * from the day of her delivery as aforesaid, * * * hire to continue until her redelivery in like good order and condition to owners (unless lost) at a port in the United Kingdom or on the Continent, Bordeaux, Hamburg, excluding Rouen, each season between March 10th and April 10th at charterer's option.

"(6) That should the steamer be on her voyage towards the port of return delivery at the time a payment of her becomes due, said payment shall be made for such a length of time as the owners or their agents and charterers or their agents may agree upon as the estimated time necessary to complete the voyage, and when the steamer is delivered to owner's agents any difference shall be refunded to steamer or paid by charterers as the case may require."

"(18) * * * The act of God, king's enemies, fire, restraint of princes, rulers, and the people, and all dangers and accidents of seas, rivers, machinery, boilers, steam navigation and errors of navigation throughout this charter party always mutually excepted."

Wabana is situated on the St. Lawrence river, and the vessel was chartered for use in the coal and iron trade. The Gans charter was, as its contents implies, made to fill up that four months of the season which the Nova Scotia charter did not desire; that being a period when the St. Lawrence river was not open to navigation.

On the 31st of March, 1915, the Nova Scotia Steel & Coal Company, Limited, executed a subcharter of the Themis to Barber & Co., Incorporated, of which the important parts are as follows:

"(1) That the said owners agree to let and the said charterers agree to hire the said steamship from the time of delivery for eight months, steamer to be placed at the disposal of the charterers at a United States port north of Hatteras, * * * to be employed in carrying lawful merchandise * * * between safe ports in B. N. A., United States of America, West Indies, Central America, Caribbean Sea, Gulf of Mexico, South America, Europe, Africa, Australia or Asia * * * *neutral trades, no contraband* [in writing]."

"(4) That the charterer shall pay for the use and hire of said vessel at the rate of £7,680 per calendar month, * * * hire to continue from the time specified for commencing the charter until her redelivery to the owners unless lost, at *a United States port north of Hatteras not later than January 1, 1916* [in writing]."

"(8) That should the vessel be on her voyage toward port of return delivery at time a payment of hire comes due, said payment shall be made for such a length of time as owners or their agents and charterers or their agents may agree upon as the estimated time necessary to complete the voyage, and when the vessel is redelivered at owner's agents any difference shall be refunded by vessel or paid by charterers as the case may require."

"(22) * * * The act of God, the king's enemies, loss or damage from fire on board in hulk or craft or on shore, arrest or restraint of princes, rulers, and people, collisions, any act, neglect, or default whatsoever of pilot, master, or crew in the management or navigation of the ship, and all and every danger and accident of the seas, canals, and rivers and of navigation of whatever nature or kind always mutually excepted."

"(27) That * * * should steamer not be ready for delivery on or about May 5, 1915, charterers or their agents to have the option of canceling this charter at any time not later than the day of steamer's readiness."

The Nova Scotia Steel & Coal Company, Limited, or the owners, which does not appear, delivered the Themis to Barber & Co., Incorporated, on April 28, 1915, so that the charter expired by its terms on December 28th. Early in August, 1915, Barber & Co., Incorporated, advertised the Themis for an Australian voyage, and they began to load her in the fourth week of the month with a cargo for New Zealand and Australia. Although for long engaged in

the shipping business and in control of a fleet of steamers, either as owners or through charter, this was the first Australian voyage undertaken by Barber & Co.. On August 13th the Nova Scotia Steel & Coal Company's agents, Gailey, Davis & Co., in a telephone conversation called the attention of Barber & Co., Incorporated, to the proposed voyage, to which Barber & Co., Incorporated, answered on that day that they "have her (the Themis) mapped out for Australasia and have so cabled owners." On August 18th Gailey, Davis & Co. answered this letter, stating that the Nova Scotia Steel & Coal Company was bound to redeliver the steamer at Philadelphia or Baltimore between the 28th (sic) and January 5th, and were not in a position to negotiate with Barber & Co. for a further extension of steamer's charter after December 28th, and that the Nova Scotia Company had requested them to impress upon Barber & Co. the necessity of delivering the steamer at Philadelphia or Baltimore not later than January 5, 1916; otherwise they would have to hold them responsible for any damages the owner might claim on them through any failure on their part to deliver her at the time stated. They further said that Barber & Co. were aware that the steamer went on charter to the libelants when surrendered by the Nova Scotia Company, that the libelants were bound to surrender her to the owners between March 10th and April 10th, and that any extension of the charter for the period between January 5th and April 10th would have to be made with the owners or the libelants. They suggested likewise the possibility of negotiations with the libelants in case they were not able to come to an arrangement with them.

On August 28th Gailey, Davis & Co. again wrote to Barber & Co., impressing upon them the importance of a return of the steamer "not later than January 5th next." On September 1st the libelants protested to the owners, and a long correspondence ensued, which it is not necessary to detail, except to say that the owners insisted that the libelants should look to the Nova Scotia Company and Barber.

The Themis cleared the port of New York on September 12th loaded with cargo to Wellington, New Zealand, and Brisbane, Sydney, Melbourne, and Adelaide, Australia. The cargo consisted of about 11,000 tons dead weight, substantially half of which was of oil in cases and barrels, and the balance distributed among other commodities. She reached the Panama Canal on September 21st. At that time slides had occurred in the canal, which kept her waiting until October 4th, when the authorities closed the canal for an indefinite period, which in fact lasted until the following April. On October 5th at 4 p. m., though it was concededly impossible to get back in season, she cleared Colon bound for Australia by way of the Cape, and arrived at Wellington, New Zealand, on December 12th. Between that date and February 23d she was either discharging or loading cargo in Australasian ports. On that day she left Newcastle, Australia, for Buenos Ayres, at which she touched and stayed for some ten days. She arrived in New York on May 5th.

Meanwhile, and on December 9, 1915, three days before the Themis reached Wellington, her first port of discharge, the libelant's attorneys wrote to the owner's agents stating that they abandoned all negotiations with Barber & Co., and would go into the market and obtain, if possible, one or two steamers to take the place of the Themis; that, as this involved a very heavy claim, they should press it against the owners, and the owners might look elsewhere for indemnification. Barber & Co. in their defense insist that thereafter it was unnecessary for them to make haste in the return of the vessel, and explained her delay in Australasian ports in part upon their knowledge so acquired that the libelants had abandoned their charter party. No point turns upon this fact, however, in the disposition of the case, except as an explanation of the delays in Australia in getting a return cargo.

Much proof was taken upon the trial respecting the conditions of the Panama Canal during September and October, 1915. In August, 1915, General Goethals, in charge of the building of the canal, left the Isthmus. He had arranged with the Secretary of War to return about the 1st of October and to leave permanently the 1st of November of that year. During his absence the canal was closed for short periods in August, and again early in September, but news reached Washington from the canal on September 12th that navigation was resumed, and on the 13th all ships of heavy draft had been passed

through. On September 20th it was reported in Washington that movements on the east bank on September 18th and 19th had again closed the canal, but that it would be open again in a week or ten days. General Goethals left New York on September 26th, supposing at that time that the difficulties were not serious, and that the canal would be opened in a week or ten days. Just before sailing he received a cable that navigation would be resumed on October 1st. He did not learn of the movement on the west bank until he was within one day of Colon, and it was this movement which resulted in the long closure. At that time he supposed that the canal would be open on October 15th or November 1st, but he withdrew his resignation, which he had presented on the supposition that the canal was permanently open. He reached the Isthmus on October 4th, visited the slides, and that night issued a public statement that he would close the canal to navigation until there was reasonable hope of maintaining a channel without frequent interruption. In his opinion, any ship in August or September was fully justified in anticipating that the canal was usable, and he himself had given that assurance to transportation companies before leaving the Isthmus in August of that year. There had been before August sporadic interruptions to navigation since August 15, 1914, when the canal was opened to commerce, but none of these had been for more than about a week's time. These difficulties had arisen from movements on the east bank.

The distance from New York to Wellington and from New Zealand to New York amounts in all to some 18,000 miles, and the average cruising speed of the Themis in the Atlantic during the preceding winter was 217.68 miles a day, at which speed it would have taken her for the distance in question 83 days 16 hours. She had from September 12th to January 5th, 115 days, which left her at that rate of sailing 31 days to discharge and load in New Zealand and Australia. Her time from Wellington to Newcastle was 18 days 6 hours, leaving her, therefore, an actual leeway for discharge and loading, if she went to only those two ports, of 13 days.

Much testimony was taken respecting the conditions of transportation across the Panama Canal in October, 1915, and it is in some conflict. It appeared that the labor available at that point was of a careless and ignorant character; that the storage facilities were cramped, and the weather conditions trying. It is true, however, that large quantities of cargo were carried across the Isthmus during that period and transshipped into bottoms on the Pacific. Just what were risk of injury to the cargo and delay in transshipping the cargo at the Isthmus cannot be certainly stated, except that the risk was substantial and some delay certain.. Nor could it be known whether a vessel could be obtained upon the Pacific side, or when, for carriage to Australasia. Evidence was also introduced respecting the possibility of bringing the cargo back to New York and transshipping it here. At that time the New York harbor was unquestionably congested with freight. The evidence fell short, however, of showing that this could not have been done, and the most that can be said is that it would have been difficult. No evidence was introduced as to the possibility of transshipment at some other port en route between Colon and Wellington.

The positions of the parties are as follows:

The libelants, that the owners are primarily bound for failure to deliver the ship on or before January 5th in accordance with their charter.

The owners, that they were not called upon to deliver the ship except upon redelivery by the Nova Scotia Steel & Coal Company, Limited, and that, as they never delivered, the owners' liability never arose.

Barber & Co., Inc., that on September 12th they were reasonably justified in undertaking a voyage to Australasia, and that the charter allowed them to sail, and to complete the voyage, although it might turn out by subsequent events to be impossible to do so within the time presented; that they were entitled to "overlap" for such time as might be necessary under the doctrine of The Straits of Dover (D. C.) 95 Fed. 690; Id., 100 Fed. 1005, 41 C. C. A. 156. Furthermore, that assuming that they were not within the doctrine of The Straits of Dover, supra, the default was excused by the exceptions both in the charter party between the owners and the Nova Scotia Steel & Coal Company, Limited, and in that between themselves and the Nova Scotia Company,

especially the exception of "accidents of canals." They insisted that, having once embarked upon the voyage and having lawfully incurred liens upon the ship to the shippers for carriage, it was not tolerable that the voyage should be broken up and the cargo transshipped, even though. as was the fact, the bills of lading of the ships gave Barber & Co. the right to transship at any place en route.

Charles S. Haight and Wharton Poor, both of New York City, for libelant.

Roscoe H. Hupper, of New York City, for owners.

D. Roger Englar, of New York City, for Barber & Co., Inc.

LEARNED HAND, District Judge (after stating the facts as above).   [1] The first question is whether the owners committed a breach in failing to deliver according to the terms of their own charter. The words used are as follows:

"To be placed at the disposal of the charterers at Philadelphia or Baltimore at owner's option upon redelivery by Nova Scotia Steel & Coal Company between December 15th and January 5th each season as called for by charter arranged for this steamer between owners and the Nova Scotia Steel & Coal Company."

The theory is that this clause, especially in the words "upon redelivery by," creates an absolute engagement between the owners and the libelants to deliver only when the Nova Scotia Steel & Coal Company surrendered.   The two charters were complementary.   The earlier, which was the Nova Scotia, provided for delivery by the owners at Wabana between April 1st and May 15th and for the term of "nine consecutive seasons."   No period to each season is fixed in the charter, except that contained in article 4 touching hire.   That article stipulates what the hire shall be, and that it shall continue "until her redelivery to the owners (unless lost) at Philadelphia or Baltimore between December 15th and January 5th at charterer's option."   The libelants' charter was of the same kind; it provided for letting the ship for "nine consecutive winter seasons," she to be placed at charterer's disposal upon surrender "by the Nova Scotia Steel & Coal Company between December 15th and January 5th each season" as called for in that charter.   This charter also did not state the length of the seasons, except in article 5, which fixed the hire and which provided that hire should continue until surrender "each season between March 10th and April 10th at charterers' option."   The difference in the dates of surrender by the libelants and of delivery by the owner to Nova Scotia Steel & Coal Company arose from the fact that the former was to be in the United Kingdom or Continent, while the latter was to be at Wabana.

The purpose of the parties was therefore to let the ship for the whole of nine years except for a single-westward voyage each year on the owners' account.   If we assume that each charter gave the charterer an overlap under the doctrine of The Straits of Dover (D. C.) 95 Fed. 690, Id., 100 Fed. 1005, 41 C. C. A. 156, and Anderson v. Munson (D. C.) 104 Fed. 913, the case is, of course, with the respondents, but for the present I shall assume the opposite; i. e., that Nova Scotia Steel & Coal Company, Limited, was bound to surrender the ship be-

tween December 15th and January 5th, and the libelants between March 10th and April 10th. The issue is then whether the libelants or the owners should assume the risk of a violation of the charter by Nova Scotia Steel & Coal Company, Limited. On the face of it, I think the owners are the natural parties to assume such a risk. The libelants could not, of course, control the ship, and had no knowledge of the responsibility of the Nova Scotia Steel & Coal Company, Limited. Each summer season was, as to them, a venture of the owners, and in the absence of some clear intimation to that effect, the owners ought to answer for its success or miscarriage. It is not as though the owners had parted with all control of their ship, as in the case of an ordinary bailed chattel. They had their master and crew, and could in fact at any time on the eve of a voyage have withdrawn her, if the Nova Scotia Steel & Coal Company, Limited, had proved obstinate in diverting her from her prospective engagements.

Nor does the position of the clause "upon delivery by" seem to me important. Those words have a proper enough meaning, which is that they should be bound to deliver only at that time within the 16 days when the Nova Scotia Steel & Coal Company should surrender to them. Their obligation was therefore in part contingent upon that surrender, it is true, but contingent only within the period which they fixed. If the contingency was to be general, I think the clause would in substance have read "each season, if surrendered under charter arranged," etc. There ought to have been some indication that libelants' charter was conditional upon the complementary charterer's performance.

The cancellation of clause 16 in the charter signifies nothing. It was obviously undesirable to give the libelants the right to cancel the whole charter for 9 years because of one default. It is true that in the Nova Scotia charter a written clause was added limiting the right of cancellation to one season, and this might have been done in the libelants' charter. Yet the argument from the deletion of that clause seems to me extreme that the libelants were bound to take the Themis for no matter how small a part of the 4 months' season which might be left. The trade of the Nova Scotia Steel & Coal Company, Limited, contemplated no general voyages with a mixed cargo, and the leeway of 16 days was in all probability enough to accommodate the parties to any delays except such as would be covered by the exceptions in the charter. I conclude, therefore, that the more reasonable explanation is that the owners meant to bind themselves to a delivery to the libelants at the time when they had bound the complementary charter to surrender to them, and that they would look to that charterer if any default occurred. Their conduct when faced with that contingency was precisely that; they did not disclaim all liability, but very wisely and properly passed on the controversy to those who must in the first instance bear it, and who, it is conceded, were able financially to respond. I cannot see that they can now escape a secondary liability.

I have assumed that the Nova Scotia Steel & Coal Company, Limited, was responsible absolutely for a surrender not later than January 5th, and that the doctrine of The Straits of Dover, supra, did not apply; the propriety of that assumption now arises. In Anderson v.

Munson, supra, Judge Brown, with whom it originated in this country, especially put the rule upon article 4 of the charter, and said that without it the owner was absolutely bound to deliver on the day stipulated. In all the subsequent American cases there has been a fixed term, and article 4 has been unlimited in its language. See The Rygja, 161 Fed. 106, 88 C. C. A. 270; Trechmann S. S. Co. v. Munson, 203 Fed. 692, 121 C. C. A. 650; Munson v. Elswick (D. C.) 207 Fed. 984; Id., 214 Fed. 84, 130 C. C. A. 612; Ropner v. Inter-American S. S. Co., C. C. A. 2d Circuit, April 10, 1917, 243 Fed. 549, —— C. C. A. ——. It is true that the same result followed upon a charter apparently without article 4 (Gray v. Christie, 5 Times L. R. 577), but the clause was present in Bucknall v. Murray, 5 Com. Cas. 312, and Istok v. Drughorn, 6 Com. Cas. 220, 7 Com. Cas. 190.

In Watson S. S. Co. v. Merryweather, 12 Asp. M. C. 353, the length of the term was fixed in article 1 of the charter, and article 4 was added with a written clause like that here, i. e., "between 15th and 31st of October." Atkin, J., was perplexed as to what meaning to give the clause, because if he confined it to the period of the term in article 1, the clause effected nothing whatever. However, he felt bound to do this, because the iteration of the parties was an evidence of their settled purpose. That case was weaker than this, because here article 4 is not meaningless. It will be remembered that in neither the libelants' nor the Nova Scotia charter does article 1 fix any term to the letting; each is merely for a "season," and the length of the season is fixed only by the added written words of article 4. If those words were not added, the court would have to decide what a "season" was from the delivery dates, and then allow any reasonable "overlap." That would make altogether impossible the division of the year into two seasons, at least if the "overlaps" might extend for one month or six weeks. The added words were therefore necessary to the complete meaning of the charter, and were not only in limitation of the "hire to continue" clause, but of the very term of the letting. The period of 16 days was thought enough to give commercial latitude for the enterprises to be undertaken, and the event of unforeseen contingencies was amply provided for by the exceptions to be considered later. That period of 16 days was the "overlap" or "twilight" zone which gave the charterer a sufficient leeway against ordinary vicissitudes, beyond which he engaged himself not to go. Such a plan was altogether reasonable.

[2] If the Nova Scotia Steel & Coal Company, Limited, must surrender the Themis by a day certain, we should expect Barber & Co.'s subcharter to be of the same kind, and that is what we find. The term was fixed, to be sure, at 8 months from the delivery date, and the peremptory written words "not later than January 1, 1916," added to article 4, were meant to define any possible "overlap" which might put the Nova Scotia Company in default either to the owners or to the libelants. Article 4 did accomplish something, nevertheless, because it gave an "overlap" in December dependent upon that day in April in which Barber & Company, Incorporated, got the ship; perhaps it was not of great consequence, but the value of fixtures had risen greatly. If the delivery was in May, on the other hand, the limitation would

have cut down the term as need was, to avoid a default by the Nova Scotia Steel & Coal Company, Limited. Hence the clause was not redundant, as it was in Watson S. S. Co. v. Merryweather. Indeed, it is hardly plausible to insist upon an indefinite "overlap" in Barber & Co.'s charter, once one concedes the unconditional obligation of Nova Scotia Steel & Coal Company, Limited, to surrender by January 5, 1916.

Barber & Co.'s obligation being, therefore, to return the ship not later than January 1st, or we may say January 5th, the remaining question is whether their admitted failure comes within any exception of either charter party. These exceptions for the purposes of this case may be treated as the same. Although Barber & Co. was cutting its time for a round trip down very short, I attach no importance to that. Were the question of the reasonableness of the voyage under the doctrine of The Straits of Dover, supra, such considerations would have been relevant, but not here where the parties defined their own "overlap" at 16 days. The only question under such a charter party is whether the charterer has come within the exceptions.

[3] Every one agrees that the source of the trouble was the slide on the west bank of the Panama Canal in October, 1915. If the case rested upon reasonable expectations when the Themis left New York, I should find not only that it was reasonable on September 12, 1915, to undertake a voyage through the canal, but that no one ought to have hesitated. That issue is, however, irrelevant unless the slides prevented surrender on January 5, 1916, and the case comes down to a definition of "prevention." Mr. Englar throughout has proceeded upon the assumption that he need not show physical prevention, but that it is enough if the subcharterer could not have surrendered in season without the most serious financial consequences which would arise from breaking the voyage. I cannot agree in such a suggestion. Without exceptions of some kind performance of a maritime contract is not excused even when prevented by physical impossibility. Barker v. Hodgson, 3 M. & S. 267; The B. F. Bruce (C. C.) 50 Fed. 118, affirmed Lumberman's Min. Co. v. Gilchrist, 55 Fed. 677, 5 C. C. A. 239. The general rule applies to charter parties as well as to other commercial contracts in which impossibility of performance does not generally excuse. By hypothesis the promisee has suffered a loss through the breach, and if the promisor wishes to avoid performance according to the terms of the promise, it is for him to foresee, and provide against, the chance that he cannot realize his assurances. Exceptions, when they are put in, excuse impossible, not unprofitable (or, as Mr. Mackay prefers to say, "impracticable"), performance. Were it not so, the risk of the charterer's ventures would be imposed upon the owners, an intolerable result. The owners' loss through delay must be made a factor in the charterer's decision not to surrender, else he is allowed to confiscate the enhanced value of the ship. If the added loss in surrendering in season is more than the enhanced value, usually the charterer will choose to break his promise, unless restrained by commercial scrupulousness, but it is a strange idea that anything in the admiralty allows him at once to break that promise and disregard the losses to other

persons. The reasoning escapes me by which he should be allowed to throw upon another the miscarriage of his own enterprises. It is quite true that Barber & Co., Incorporated, were involved in serious loss if they transshipped at the Isthmus, in the Antilles, at the Cape, or in New York, but the libelants were involved in more serious loss if they did not. There is a frank ingenuousness in calling upon the libelants to assume their loss.

Nor is there the least warrant for saying that the admiralty has ever recognized anything of the sort. Suppose the ship had learned of the slide when one day out of New York. Will it be seriously argued that Barber & Co. could out of hand have confiscated the libelants' winter season? If not, when does the supposed doctrine apply? All the cases cited are where the performance has been physically prevented, except the "strikes" exception, of which more in a moment. It is true that under the "restraint of princes" clause the ship need not await actual arrest (The Kronprinzessin Cecilie, 238 Fed. 668), but that is no exception to the rule. The possibility of performance is in such cases prevented, quite as much as though a master delayed in port to avoid an advertised hurricane. Continued performance may become impossible by an imminent obstacle, though the ship does not persist in challenging the inevitable. The "strikes" clause is a true exception, but only, as Judge Ward says in The Toronto, 174 Fed. 632, 98 C. C. A. 386, because otherwise it could have no meaning. Wood v. Keyser (D. C.) 84 Fed. 688. Strikes generally arise over wages disputes, and every one knows that money will settle these; and an exception against strikes can therefore only mean an exception against the extra cost of strikes.

On the other hand, there are direct cases to the contrary. Thus the Court of Appeal in Assicurazioni, etc., v. Bessie Morris Co., 7 Asp. M. C. 217, held that the exception from perils of the sea did not absolve the owner from prosecuting the voyage unless either the ship could not be got off the strand, or unless the loss involved in her repairs was equal to her whole value. In Associated Portland Cement Mfrs., Ltd., v. Cory, 31 Times L. R. 442, the defendants sought to excuse their default under the restraint of princes clause, because half their tonnage had been commandeered by the British government. It did not appear, however, that performance thereby became impossible, but only more expensive, and the court (Rowlatt, J.) held for the plaintiff. A similar case is Bolckow v. Compania, etc., 33 Times L. R. 111.

The right of Barber & Co., Incorporated, to continue the voyage is, however, also placed upon another theory; i. e., the liability of the ship to the cargo. It is, of course, well settled that the bills of lading signed by the master for the charterer create a lien upon the ship in favor of the cargo as soon as it comes aboard. The Alert, 61 Fed. 113, 9 C. C. A. 390, following the dictum of Mr. Justice Curtis in Schooner Freeman v. Buckingham, 18 How. 182, 15 L. Ed. 341. No one disputes this, but the result of its application here would be to commit the ship to the voyage as soon as any cargo had been stowed. Therefore, if the slide had occurred in September while she was still

in port, instead of October, the Themis must have prosecuted her voyage, though it was obvious that it involved a breach of the charter party. Such a consequence is very near to a reductio ad absurdum. The whole basis of the theory in law disappears, moreover, when one observes that article 14 of each charter binds the charterer to indemnify the owner for any liability arising from the bills of lading. As against the ship the liens would be good, but the charterers remain, what perhaps they would have been without that article, the primary obligors. In that view the whole point adds nothing to the original position of the charterers that they were entitled to continue the voyage at the expense of the owners, or the next charterers. The liens of the shippers were expenses to which they were liable and which were indeed a necessary factor in the calculation which should have controlled their decision on October 5th to sail for the Cape. Those liens were no more than items in that calculation, and the fact that the ship stood secondarily liable was an irrelevant incident.

No one urges that the canal slides in fact prevented the physical surrender of the ship on time. It is not as though the Themis had come back across the Pacific and found the canal blocked at Panama. The slides made impossible the contemplated voyage, but that was all, and the owners by the exception made no assumption of such a risk. Suppose, for example, the Themis, bound to Bombay, found herself effectively blocked by Austrian and Turkish submarines, and chose to go around the Cape. Consistently it must be urged that under the "king's enemies" clause she would be entitled to clear the port of New York with the certain expectation of defaulting in her surrender day. Certainly it would make no difference if she got the news at Gibraltar. The charter does not affect to touch the profits; it gives the ship and leaves the use to the charterer. The exception goes no further than the charter; it excuses the mutual performances stipulated, but only those. The charterers' attempted interpretation in effect extends the letting by conditions dependent upon the profits of the venture, and subjects the engagements of the parties to the uncertainties of their business success. Such an interpretation is directly contrary to the very meaning of a commercial contract.

Therefore I find it unnecessary to decide whether the "accidents of canals" exception means only a strand in the canals or some other danger due to canals. The same is true of the slide as an "act of God," or an "accident of navigation." I may, indeed, assume that, did it prevent the surrender, it would be one of these as well as an "accident of canals." The result is that the charter was broken without excuse, and that Barber & Co., Incorporated, are liable.

The decree will hold both the owners and Barber & Co., Incorporated, liable with the usual clause directing the libelants first to exhaust their remedies against Barber & Co., Incorporated, and will direct a reference to ascertain the damages.